## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TRACEY N. MULLINS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:18cv00017 |
| | ) | |
| **ANDREW SAUL,[1]** | ) | **MEMORANDUM OPINION** |
| **Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Tracey N. Mullins, ("Mullins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011, West 2012 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is automatically substituted for Nancy A. Berryhill as the defendant in this case.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed applications for DIB and SSI on February 19, 2013, alleging disability as of February 11, 2012, based on shoulder problems; back problems; hypothyroidism; sleep apnea; arthritis; and anxiety.[2] (Record, ("R."), at 13, 359-60, 363-66, 383.) The claims were denied initially and upon reconsideration. (R. at 221-23, 228-30, 234, 237-39, 241-46, 248-50.) Mullins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 251-52.) A hearing was held on September 9, 2016, followed by a supplemental hearing on January 20, 2017, at both of which Mullins was represented by counsel. (R. at 51-92.)[3]

By decision dated April 19, 2017, the ALJ denied Mullins's claims.[4] (R. at

---

[2] Mullins protectively filed a prior application for DIB on May 15, 2009, alleging disability as of March 27, 2009. (R. at 122.) This claim was denied initially and on reconsideration. (R. at 122.) An ALJ rendered an unfavorable decision on July 28, 2011, and the Appeals Council denied Mullins's request for review. (R. at 122-32, 379.) Mullins did not appeal to this court. (R. at 379.)

[3] After the initial hearing, the ALJ sent out medical interrogatories for an "independent look at the case." (R. at 53.) After that, Mullins's counsel requested a supplemental hearing.

[4] The ALJ found a closed period of disability from February 11, 2012, through February 28, 2013. However, he found Mullins was not disabled for the period from March 1, 2013, through the date of his decision. Interestingly, although Mullins alleged disability beginning February 11, 2012, the ALJ also addressed the period from July 29, 2011, the day following the date of the prior ALJ's decision, through February 10, 2012, the day before the ALJ found Mullins to be disabled.

13-43.) The ALJ found that Mullins met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2014. (R. at 17.) The ALJ also found that Mullins had not engaged in substantial gainful activity since the alleged onset date. (R. at 17.) The ALJ found that, beginning March 1, 2013, the medical evidence established that Mullins suffered from the following severe impairments: degenerative disc disease; coronary artery disease; history of right shoulder replacement; hypertension; hypothyroidism; obesity; depression; anxiety; thoracic and lumbar spine fractures with subsequent surgery; and drug-induced psychotic disorder, in remission after February 2013. (R. at 17-18, 34.) The ALJ found that, beginning March 1, 2013, Mullins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 34.) The ALJ found that, as of March 1, 2013, Mullins had the residual functional capacity to perform simple, unskilled sedentary work[5] that required no more than occasional pushing/pulling with the upper extremities or overhead reaching with the right arm; no more than occasional kneeling, crawling, crouching, stooping, balancing or climbing; no more than occasional exposure to temperature extremes, humidity and vibrations; no exposure to hazards; and he needed access to a restroom on regularly scheduled breaks. (R. at 35.) The ALJ found that Mullins was unable to perform his past relevant work during this time period, but other jobs existed in significant numbers in the national economy that he could perform, including jobs as an assembler, an addressing clerk

On appeal to this court, Mullins challenges only the period from March 1, 2013, through April 19, 2017, the date of the ALJ's partially favorable decision. That being the case, only the ALJ's findings that are relevant to this period will be included in this opinion.

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of standing or walking are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2019).

and a weight tester. (R. at 31-32, 42.) Thus, the ALJ found that, after February 28, 2013, Mullins was not under a disability as defined under the Act and was not eligible for DIB or SSI benefits. (R. at 42.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2019).

After the ALJ issued his decision, Mullins pursued his administrative appeals, (R. at 354), but the Appeals Council denied his request for review. (R. at 1-5.) Mullins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2019). The case is before this court on Mullins's motion for summary judgment filed January 22, 2019, and the Commissioner's motion for summary judgment filed February 12, 2019.

## *II. Facts*[6]

Mullins was born in 1968, (R. at 378), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a tenth-grade education and past relevant work experience as a coal hauler and a sample collector. (R. at 72-74, 88-89, 384.) At the initial hearing, on September 9, 2016, Mullins testified he was involved in a motor vehicle accident in February 2012, after hitting a patch of black ice. (R. at 74-75.) He underwent back surgery in July 2012, but was in a lot of pain and "got out of control on the medications." (R. at 75, 78.) Mullins testified that, after the surgery, he was limited by pain in his mid- and lower back, as well as

---

[6] As stated above, on appeal, Mullins argues the ALJ erred in his disability determination only regarding the time period beginning on March 1, 2013. Thus, for SSI purposes, the relevant time period is through the date of the ALJ's decision, and for DIB purposes, it is through December 31, 2014, the date last insured. That being the case, the court largely will restrict its discussion of the medical evidence to the relevant time period, except when clarification of the record is necessary.

pain and numbness in his legs and numbness in his feet, which continued at that time. (R. at 80, 87.) He stated he had experienced "back trouble" for years prior to the accident, including pain and instability. (R. at 80.) Mullins testified his leg numbness caused instability issues, and he had to watch where he stepped. (R. at 81.) He stated that Neurontin was "not really" helping. (R. at 81.) Mullins testified he had to constantly move to relieve his pain and numbness, and getting off his feet sometimes helped for "a little while." (R. at 81-82.) Mullins testified both of his legs swelled daily, and he could stand for only 20 to 30 minutes at a time. (R. at 82, 84.) He estimated he spent over half of an eight-hour day with his legs elevated to prevent fluid build-up. (R. at 82.) Mullins testified he was taking a fluid pill; however, he stated he could not take it when he was "out" because he could not control his urine. (R. at 83.) He stated he could not stoop, squat, bend or kneel because he would lose his balance and fall, and these activities also caused his bladder to empty. (R. at 85-86.) Mullins testified he did not think he could perform these activities for two hours, off and on, throughout the day. (R. at 86.)

Mullins testified he had urinary urgency and difficulty completely voiding at times, and he had to use the restroom about twice hourly. (R. at 83.) He testified these difficulties began after his back surgery. (R. at 83.) He stated he was not receiving any treatment for his urinary incontinence due to his lack of insurance, and he no longer used a catheter. (R. at 84.) Mullins also stated he had pain in both shoulders, noting the right shoulder had been replaced in 2009 and was reinjured in the motor vehicle accident. (R. at 78-80.) He stated he wrote with his left hand, but did a lot of things with his right hand. (R. at 84-85.) Mullins testified he could not lift anything heavy with his right arm due to pain, he could not reach overhead with his right arm, and he sometimes lost his grip. (R. at 85.) He estimated he could lift items weighing up to 18 pounds. (R. at 85.) He stated he could reach overhead "to

an extent" with his left arm. (R. at 85.) Mullins testified his doctors wanted him to see more specialists, including a nephrologist and a cardiologist, but he could not do so since he lost his insurance after a 2014 divorce. (R. at 78.)

Mullins also testified he had difficulty with anxiety and depression, but was not currently taking any medications, despite having two to three panic attacks weekly. (R. at 86.) He stated he had not taken anything for anxiety for fear of becoming dependent on it. (R. at 86.) Mullins testified he had difficulty focusing and staying on task, noting he usually did not finish things he started. (R. at 87.) He also testified he no longer was seeing counselor Farley because he could not afford it without insurance. (R. at 88.) Mullins testified he had been charged with driving under the influence the previous New Year's Eve, which was still pending, but he had not lost his driver's license. (R. at 76.) He stated he previously had helped care for a friend's wife who was on dialysis, noting he mostly sat with her. (R. at 76-77.) He also stated he rode around with this friend. (R. at 76.)

Asheley Wells, a vocational expert, also was present and testified at Mullins's hearing. (R. at 88-94.) Wells classified Mullins's past work as a coal hauler as medium[7] and unskilled and as a sample collector as light[8] and unskilled, but, as performed by Mullins, at the heavy[9] exertional level. (R. at 88-89.) Wells was asked

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time and lifting and carrying items weighing up to 25 pounds frequently. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2019).

[8] Light work involves lifting items weighing up to 20 pounds at a time and lifting and carrying items weighing up to 10 pounds frequently. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2019).

[9] Heavy work involves lifting items weighing up to 100 pounds at a time and lifting and carrying items weighing up to 50 pounds frequently. If someone can perform heavy work, he also

to consider a hypothetical individual of Mullins's age, education and work history, who could perform simple, routine, unskilled sedentary work that required no more than occasional pushing/pulling with the upper extremities and overhead reaching with the right extremity; occasional climbing, balancing, stooping, kneeling, crouching and crawling; that did not require work around hazards; that required no more than occasional exposure to extreme temperatures, humidity and vibration; and that allowed regular breaks to access the restroom. (R. at 89-90.) Wells testified that such an individual could perform the sedentary jobs of an assembler, an addressing clerk and a weight tester. (R. at 90.) Wells testified that an individual who could not balance, stoop, kneel, crouch and crawl could not perform sedentary work. (R. at 90.) Wells next was asked to consider the first hypothetical individual, but who also could not relate to co-workers; interact with supervisors; deal with ordinary work stresses; function independently; maintain attention and concentration even in between regularly scheduled breaks; carry out even simple job instructions; and would miss two or more days monthly. (R. at 90.) Wells testified that such an individual could not perform competitive employment. (R. at 91.) Wells testified that an individual who would be off task for greater than 10 percent of the workday, as well as an individual who would miss a couple of days of work monthly, could not perform competitive employment. (R. at 92-93.) Wells testified that an individual who was markedly limited in right shoulder range of motion; who was limited in lumbar flexion; who could stand and/or walk no more than two to three hours in an eight-hour workday; who could sit no more than four to six hours in an eight-hour workday; and who could not climb, balance, stoop, kneel, crouch, crawl or reach overhead with the right arm, could not perform sedentary work. (R. at 93-94.)

can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2019).

At the end of this hearing, the ALJ stated he would hold the record open in order to send Mullins's case out for an independent review as to Mullins's impairments and limitations since 2013. (R. at 94.) At that juncture, counsel also stated his intent to obtain an assessment from The Health Wagon, where Mullins recently had been treating. (R. at 94-95.)

At a supplemental hearing on January 20, 2017, the ALJ stated he had received the independent review, and Mullins's counsel had submitted some updated treatment records from The Health Wagon, as well as some opinion evidence from nurse practitioner Boyd. (R. at 53.) The ALJ advised Mullins he was prepared to issue a closed period of disability. (R. at 55.) Mullins testified his dosages of Neurontin and Synthroid had been increased since the prior hearing. (R. at 55-56.) He testified he had rods in his back, which made him stiff and caused difficulty stooping, bending or squatting. (R. at 57-58.) He further testified numbness in his legs and feet caused him to lose his balance when he attempted such postural activities. (R. at 58.) Mullins testified he did not even have pinprick sensation. (R. at 58-59.) He testified his right arm was weak and would "freeze" or "lock up" if he tried to hold it out for two to three minutes or lift something too heavy. (R at 59.) He also stated he had difficulty reaching overhead with the right arm, stating he could not raise it all the way up. (R. at 59.) Mullins stated he wrote with his left hand, but his right arm was the stronger of the two. (R. at 60.) He stated he could not use his right arm/hand to handle objects or to lift and grasp off and on for up to two and one-half hours in an eight-hour workday due to pain. (R. at 60.) Mullins also testified his fingertips on both hands were constantly numb and tingled. (R. at 60-61.) The ALJ went off the record to allow Mullins a restroom break. (R. at 61-62.) According to a letter from the ALJ, dated January 30, 2017, the court reporter forgot to restart the recording when Mullins returned, although she continued to take notes. (R. at 349.)

The ALJ offered counsel multiple options, including holding another supplemental hearing, as well as accepting the court reporter's typed notes as the sworn testimony at the hearing if counsel felt they adequately captured the testimony he wanted to present at the hearing. (R. at 349.) The ALJ stated he was attaching a copy of the notes to this letter.[10] (R. at 349.) Counsel responded on February 6, 2017, stating the notes accurately reflected the testimony. (R. at 351.)

In rendering his decision, the ALJ reviewed medical records from Mountain View Regional Medical Center; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Gene Godwin, M.D., a state agency physician; Holston Valley Imaging Center; Johnston Memorial Hospital; Dr. Thomas Roatsey, M.D.; Patrick Farley, Ed.D., L.P.C., a licensed professional counselor; Southwest Virginia Outpatient Center; Blue Ridge Neuroscience; Holston Valley Medical Center, ("Holston Valley"); Lonesome Pine Hospital, ("Lonesome Pine"); Southwest Virginia Mental Health Institute; Medical Associates of Coeburn; Dr. Nicanor Concepcion, M.D.; Lab Corp; Elizabeth Jones, M.A.; Wellmont CVA Heart Institute; The Health Wagon; Dr. Sung Joon Cho, M.D.; Pikeville Medical Center; Norton Community Hospital; Dr. Peter Schosheim, M.D.; and Ramona Boyd, F.N.P.

For background purposes, the record shows that Mullins underwent a total right shoulder replacement in July 2009. He was hospitalized for three days in July 2010 after suffering a heart attack, for which he underwent cardiac catheterization and stenting without complication. Mullins remained stable on routine medications. A January 2011 MRI of Mullins's right shoulder showed mild tendinosis, osteoarthritis and ganglionic cysts, but there were no neuropathic changes in any of

---

[10] These notes do not appear to be included in the record on appeal.

the rotator cuff muscles or evidence to suggest nerve compression. In April 2011, a lumbar MRI showed mild degenerative disc disease with disc protrusions, but no nerve root compromise or stenosis. In October 2011, he reported he felt well with only minor complaints. He reported improvement in his conditions, including chronic shoulder pain, back pain and anxiety, with medication, despite reporting only fair compliance with his anxiety treatment. Mullins was taking Xanax for anxiety and Norco for shoulder pain, as well as routine medications for coronary artery disease. Mullins was not diagnosed with depression, and he took no anti-depressants. In January 2012, shortly before Mullins's motor vehicle accident, he advised his primary care provider that his bilateral shoulder and low back pain were improved with rest and medications. Mullins was taking benzodiazepines for anxiety.

Mullins was involved in a serious motor vehicle accident on February 11, 2012, in which he fractured his thoracic and lumbar spine in multiple locations, as well as his clavicle. He was hospitalized and in a skilled nursing facility for about a month after this accident. Mullins was prescribed strong pain medications, including Norco and oxycodone, and he was in a back brace for approximately eight weeks. He also attended physical therapy. At that time, Mullins was taking Xanax for anxiety. Shortly before July 2012, Mullins began to complain of urinary incontinence, back pain, leg pain and his legs giving way. Mullins underwent a spinal fusion surgery, during which hardware was placed, in July 2012. In September 2012, he reported his back pain was decreasing. He also had concerns of urinary retention, so he had been using a catheter. At that time, Mullins did not mention shoulder pain or related symptoms. The surgeon continued to prescribe opioid pain relievers. Mullins did not receive significant orthopedic treatment after that time.

In August 2012, Mullins saw a urologist, with complaints of nocturia, slow urine flow and urinary retention. He was diagnosed with urinary retention secondary to obstructive benign prostate hyperplasia with cystitis, and a catheter was placed. Mullins had problems voiding without the catheter until December 2012, and it was removed in January 2013, and he was able to void properly without it. Mullins canceled his next urology appointment in February 2013.

Mullins was hospitalized on a few occasions for acute mental symptoms related to substance abuse during his period of disability. He testified he developed a problem with opioid pain medications after his motor vehicle accident, but statements from his family to treating practitioners suggest he had problems with drug abuse for years before this. In May 2012, Mullins was hospitalized pursuant to a temporary detention order, ("TDO"), for about two weeks, after his mother found him very confused and hallucinating. He stabilized after receiving medications. Mullins was diagnosed with opioid abuse and benzodiazepine abuse, possible substance-induced psychosis with hallucinations, delirium and anxiety. He, again, was psychiatrically hospitalized for four days beginning in November 2012, pursuant to a TDO, with symptoms of delirium and confusion with hallucinations. Mullins was stabilized with medications and detoxified from prescription substances he had abused. He was diagnosed with opioid dependence and sedative/hypnotic dependence, and he was discharged home with a normal mental status. Mullins was psychiatrically hospitalized for a third time, beginning in February 2013, for about eight days pursuant to another TDO after presenting to the emergency department seeking an early refill of pain medication. He reported hallucinations. Mullins weaned off Lortab, Valium was discontinued, and he received medications to stabilize his condition. Mullins was diagnosed with opioid abuse and

sedative/hypnotic abuse, and his Global Assessment of Functioning, ("GAF"),[11] score was assessed at 55 to 60[12] upon discharge. Mullins claims he stopped abusing drugs in 2013.

I now will turn to my discussion to Mullins's medical treatment during the time period currently at issue – March 1, 2013, through April 19, 2017. Mullins was hospitalized with pneumonia at Lonesome Pine from July 30, 2013, to August 1, 2013, during which time he had no symptoms of active angina. (R. at 1225.) He was treated with antibiotics and discharged home with instructions to follow up with his primary care provider. (R. at 1225.)

On September 26, 2013, an electrocardiogram, ("EKG"), was deemed "borderline." (R. at 1175.) On October 24, 2013, Mullins saw Polly Kramer, P.A., a physician assistant at Wellmont CVA Heart Institute, for an evaluation of edema. (R. at 1196.) Kramer noted Mullins's history of coronary artery disease and congestive heart failure, and she noted he last saw Dr. R. Keith Kramer, M.D., a cardiologist, in September 2011, after which he failed to return for a six-month follow up. (R. at 1196, 1200-02.) Mullins reported that two months previously, he ran out of cardiac medications, including Lisinopril, Atenolol and Plavix, and over that time, he had experienced occasional, random mid-chest tightness and a "random knife-like pain" between the shoulders. (R. at 1196.) Nonetheless, Mullins reported he walked about a half hour to an hour a few times weekly. (R. at 1196.) He denied

---

[11] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health – illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), at 32 (American Psychiatric Association 1994).

[12] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

dyspnea on exertion, orthopnea and paroxysmal nocturnal dyspnea. (R. at 1196.) Mullins stated, over the prior two months, he had noticed gradual fluid retention with swelling of the face, hands and legs. (R. at 1196.) He also noted his blood pressure was elevated at a medical appointment the previous month, at which time his cardiac medications were resumed, with Lisinopril being increased, and Lasix being started. (R. at 1196.) Since that time, the edema had improved, but not resolved. (R. at 1196.) Mullins also reported vague spells of heart racing, which he attributed to severe anxiety. (R. at 1196.) He denied recreational drug use. (R. at 1197.)

On physical examination, Mullin's blood pressure was 129/84, he had a regular heart rhythm, S1 and S2 heart sounds were normal, there was no S3 or S4 gallop, and no extra heart sounds or murmurs were detected. (R. at 1198.) Right and left carotid upstrokes were normal, and there were no carotid bruits. (R. at 1198.) There was no clubbing in the extremities, but there was trace lower extremity edema bilaterally. (R. at 1198.) Mullins was fully oriented. (R. at 1198.) Kramer diagnosed Mullins with coronary artery disease, native vessel; ischemic cardiomyopathy; edema; tobacco abuse; and hyperlipidemia. (R. at 1199.) She ordered a nuclear stress test and an EKG, and she scheduled a follow-up appointment with Dr. Kramer in one year. (R. at 1199.) She continued Mullins on medications. (R. at 1199.)   A nuclear stress test, dated November 19, 2013, showed no ischemic changes with pharmacologic stress. (R. at 1194.) There was a small area of mild intensity, predominantly fixed myocardial perfusion abnormality consistent with a mixed defect (predominantly scar) in the inferior and apical territory. (R. at 1195.) There was normal rest and post-stress left ventricular ejection fraction. (R. at 1194-95.) An echocardiogram from the same day showed a mildly dilated left atrium; borderline right atrial enlargement; trace to mild mitral regurgitation; and there was borderline aortic root dilation. (R. at 1217-18.)

On November 8, 2013, Alan Entin, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Mullins in connection with the initial determination of his claims. (R. at 149-50, 165-66.) Entin found Mullins was mildly restricted in his activities of daily living, had moderate difficulties in his abilities to maintain social functioning and to maintain concentration, persistence or pace and had experienced three episodes of decompensation of extended duration. (R. at 149, 165.) Entin opined Mullins would be able to perform simple, routine work that did not include complex and detailed tasks. (R. at 150, 165-66.) Entin also completed a mental residual functional capacity assessment, finding Mullins was moderately limited in his ability to understand, remember and carry out detailed instructions and to respond appropriately to changes in the work setting. (R. at 151-53, 167-69.) In all other areas, Entin opined Mullins was not significantly limited, and he concluded Mullins could manage the mental demands of many types of jobs not requiring complicated tasks. (R. at 152-53, 167-69.)

Mullins saw Elizabeth A. Jones, M.A., a licensed senior psychological examiner, on October 30, 2013, for a consultative evaluation at the request of the Agency.[13] (R. at 1179-83.) Mullins reported driving frequently, although a friend drove him to this appointment. (R. at 1179.) His grooming and hygiene were appropriate, he was cooperative, and his affect was predominantly bright with congruent mood. (R. at 1179.) Mullins ambulated somewhat slowly and grimaced when sitting or standing. (R. at 1179.) He advised Jones he had never attended mental health counseling because he "worked all the time," but he stated he was prescribed Xanax for anxiety about eight to nine years previously. (R. at 1180.) He

---

[13] While Jones completed this evaluation, she was supervised by Diane L. Whitehead, Ph.D., a licensed clinical psychologist. (R. at 1183.)

further advised he had taken opiates previously, but he stopped taking all his medications, including Xanax, in February 2013. (R. at 1180.) Mullins stated, due to overuse of pain medications and Xanax, he was psychiatrically hospitalized three times, the most recent of which was December 2012. (R. at 1180.) Jones noted medical records from Lonesome Pine in February 2013 showed a diagnosis of substance abuse and that his mental status was "confused, disoriented, and speech is garbled." (R. at 1180.) Mullins reported attempting to return to work in July 2013, driving a coal truck for a friend, but his back "couldn't handle it." (R. at 1180.) He stated he had never been fired from a job. (R. at 1181.)

On mental status examination, Mullins did not exhibit any significant memory deficits, but he stated he had more difficulty with short-term memory as opposed to long-term memory. (R. at 1181.) His affect was predominantly bright with a congruent mood; eye contact appeared to be excellent, but Jones could not see his eyes through dark glasses; he had no difficulty with attention or concentration and responded to inquiry without repetition; there was no evidence of psychomotor agitation or retardation; he denied hallucinations and delusions, but stated he had them "a time or two" when taking medications; there was no evidence of any disordered thought processes; his stream of conversation was appropriate; he was rational and alert; he was able to recall four of five items immediately and four of five items after 20 minutes; and he was able to complete serial sevens backwards from 100 to 65 "very quickly." (R. at 1181.) Jones opined Mullins was functioning in the average range of intelligence. (R. at 1181.) When asked about current depression, Mullins stated he had more difficulty with his "nerves," reporting he had two panic attacks monthly. (R. at 1181.) However, he stated this was an improvement from previously. (R. at 1181.) Mullins reported normal energy, he stated he "talk[ed] to a couple of women," and he denied suicidal thoughts, as he

could not do that to his two sons. (R. at 1181.)

In describing his daily activities, Mullins stated he went out with his friend and did a lot of "running." (R. at 1181.) He also stated he helped take care of his friend's wife, who was on dialysis. (R. at 1181.) Mullins stated he liked being outside, and he sometimes watched television. (R. at 1181.) He stated he vacuumed some before having to sit down, but he did his own laundry and enjoyed cooking, but did not like to clean the kitchen. (R. at 1181-82.) He reported having both a checking and a savings account. (R. at 1182.) Mullins stated he bathed daily and could travel unaccompanied. (R. at 1182.) Jones stated initiative and effectiveness appeared "quite good." (R. at 1182.) Jones stated Mullins had no difficulty relating to her and should have no difficulty relating to others. (R. at 1182.) However, she stated he might require assistance in managing his finances effectively due to substance dependence. (R. at 1182.)

Jones concluded Mullins was not limited in his ability to understand and remember both simple and detailed instructions; mildly limited in his ability to sustain concentration and persistence due to mild anxiety; he should be able to work in proximity to others without being distracted by them; he was not limited in his ability to interact in a socially appropriate manner; he maintained basic standards of neatness and cleanliness; he was not limited in the area of adaptation, as he traveled unaccompanied to unfamiliar places; and he was capable of responding appropriately to changes in the work setting. (R. at 1182.) Jones diagnosed Mullins with anxiety disorder, not otherwise specified; opioid dependence, early full remission; sedative, hypnotic or anxiolytic dependence, early full remission; and she assessed his GAF score – current, as well as both highest and lowest over the prior

six months – at 70.[14] (R. at 1182-83.) Jones opined Mullins might benefit from substance abuse counseling to assist him in maintaining abstinence. (R. at 1183.)

On November 26, 2013, Dr. Richard Surrusco, M.D., a state agency physician, in connection with the initial denial of Mullins's claims, stated there was no current evidence on file to indicate his current functioning, as Mullins failed to attend two scheduled consultative physical examinations that were needed to fully evaluate his condition. (R. at 148, 164.) Therefore, Dr. Surrusco noted Mullins's claims were being denied for "failure to cooperate." (R. at 148, 164.)

Mullins presented to the emergency department at Lonesome Pine on January 20, 2014, with complaints of abdominal pain and constipation for three to four days. (R. at 1233.) No mental status changes were noted, and he denied illicit drug use. (R. at 1233.) Mullins reported being on no medications at that time. (R. at 1233.) Examination was normal, including mental status and neurological, except for a distended abdomen, hypoactive bowel sounds and upper abdominal tenderness to palpation. (R. at 1233-34.) He was fully oriented without motor or sensory deficits, and he exhibited no extremity tenderness, he had full range of motion in all extremities, and he had no extremity edema. (R. at 1235.) Mullins reported he smoked daily. (R. at 1234.) A urine drug screen was negative for amphetamines, barbiturates, cocaine metabolites and opiates, but was positive for marijuana and benzodiazepines. (R. at 1244-45.) An EKG was abnormal, showing low voltage with right axis deviation and nonspecific T wave abnormalities. (R. at 1250-51.) Mullins was diagnosed with constipation and discharged in stable condition. (R. at 1235-36.)

---

[14] A GAF score of 61 to 70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning … but generally functioning pretty well. …" DSM-IV at 32.

On May 6, 2014, Mullins saw Mary Beth Bentley, F.N.P., a family nurse practitioner at The Health Wagon Inc. Wise, to establish new patient status and obtain assistance with his medications. (R. at 1305.) Mullins reported he had not seen a primary care provider since the previous year due to lack of insurance. (R. at 1306.) He advised Bentley of the prior heart attack in 2009 and seeing his cardiologist once, but he stated he did not return for a follow up. (R. at 1306.) Mullins reported some right jaw pain and weakness for two weeks, but he denied current pain. (R. at 1306.) He stated he continued to smoke daily, and he admitted using drugs other than those prescribed for medical reasons in the previous 12 months. (R. at 1305-06.) Mullins denied chest pain at rest and with exertion, difficulty lying flat, dyspnea on exertion, fluid accumulation in the legs, irregular heartbeat, palpitations and shortness of breath. (R. at 1306.) He also complained of chronic low back pain and neck pain since the motor vehicle accident. (R. at 1306-07.) He denied decreased sensation in the extremities, as well as foot pain at rest and with exertion, but he complained of leg pain at rest and with exertion. (R. at 1307.) Mullins reported a history of anxiety and depression, previously treated with anti-depressants and Xanax, but he stated he had stopped all medications. (R. at 1307.) Mullins stated he did not feel like he currently needed these medications. (R. at 1307.) On physical examination, Mullins was alert, cooperative and oriented with intact cognitive function; he had good judgment and insight; clear speech; thought content without suicidal ideation or delusions; and logical and goal-directed thought process. (R. at 1305.) He had no murmur, a regular heart rate and rhythm, normal S1 and S2; he was nontender to spinal palpation; he had a decreased range of motion in the shoulders; the extremities were without clubbing, cyanosis or edema; peripheral pulses were 2+; and neurological examination was intact, including motor strength and sensation in all extremities. (R. at 1305.) Bentley diagnosed Mullins with benign essential hypertension and unspecified hypothyroidism, and she prescribed

Lisinopril, Atenolol and Synthroid, and she strongly advised smoking cessation. (R. at 1306.) Mullins had an abnormal EKG that day and, coupled with his complaints of right jaw pain, Bentley advised him to go to the emergency department for further evaluation. (R. at 1306.)

Mullins presented to Bristol Regional Medical Center for further evaluation of the abnormal EKG, which showed a possible heart attack. (R. at 1260, 1266.) He denied chest pain or shortness of breath, but reported feeling mildly weak, in general, for a few days. (R. at 1260.) Mullins's blood pressure was 143/101. (R. at 1261.) He was alert and oriented, with a normal heart rate and rhythm, as well as normal heart sounds and intact distal pulses. (R. at 1261.) Musculoskeletal examination showed normal range of motion and no edema or tenderness. (R. at 1261.) Mullins had a normal mood and affect. (R. at 1262.) A chest x-ray showed no acute changes from a February 2013 study. (R. at 1262, 1264.) Mullins was diagnosed with an old heart attack, hypertension and noncompliance. (R. at 1258.)

Mullins returned to Bentley on May 13, May 27 and June 24, 2014. He complained of increased edema to the lower extremities, sleep disturbance, fatigue and stressors and anxiety related to his physical condition and lack of income. (R. at 1296-98, 1300-02.) Mullins denied frequent urination, weakness, shortness of breath, chest pain, fluid accumulation in the legs, irregular heartbeat, palpitations, decreased sensation in the extremities, foot pain and leg pain at rest. (R. at 1297, 1301.) He also denied anxiety, depression, substance abuse and suicidal thoughts. (R. at 1297-98, 1302.) Mullins's blood pressure was 118/84, 147/81 and 111/75, respectively. (R. at 1293, 1296, 1300.) On examination, Mullins was pleasant, alert and oriented with intact cognitive function; he was cooperative; he had good eye contact, judgment and insight; thought content was without suicidal ideation or

delusions; and thought process was logical and goal-directed. (R. at 1296, 1300.) He had full range of motion of the neck; cardiac examination was normal; he had no clubbing or cyanosis of the extremities; peripheral pulses were 2+; and neurological examination was intact, including normal motor strength in all extremities and intact sensation. (R. at 1296, 1300.) On May 13, 2014, Mullins did exhibit 1+ pitting edema in the lower extremities. (R. at 1300.) Bentley diagnosed hypothyroidism; hypertension; hyperlipidemia; and other specified disorders resulting from impaired renal function, and she continued him on medications, adjusting his Synthroid dosage. (R. at 1293, 1296, 1300-01.) She advised Mullins to modify his lifestyle with diet and exercise, smoking cessation and medication compliance. (R. at 1296-97, 1301.) On May 27, 2014, Bentley referred Mullins to a cardiologist, given his history of heart attack. (R. at 1295.) Mullins missed this appointment, stating he did not receive the message, but would make another appointment upon his return from being "out of town for a few days." (R. at 1295.) On June 24, 2014, Bentley gave Mullins various medical passes for the upcoming Remote Area Medical, ("RAM"), clinic,[15] including one for cardiology, as he still had not seen a cardiologist. (R. at 1293.)

On August 9, 2014, Dr. Sung-Joon Cho, M.D., completed a consultative physical evaluation of Mullins's back and shoulder impairment at the request of the Agency. (R. at 1310-14.) Mullins walked with an unremarkable gait without any assistive devices. (R. at 1310.) Dr. Cho reviewed Mullins's medical records, noting his 20-year history of chronic back pain, exacerbated by the February 2012 motor vehicle accident and the T11-T12 instability with vertebral collapse requiring surgery in July 2012. (R. at 1310-11.) Dr. Cho further noted Mullins's continued

---

[15] RAM clinics offer free mobile medical clinics to underserved and uninsured individuals. *See* ramusa.org (last visited Mar. 24, 2020).

complaints of chronic numbness in the feet, as well as his denials of radicular leg pain. (R. at 1311.) Mullins reported lacking leg strength and resulting difficulty walking on uneven terrain. (R. at 1311.) He reported he stopped taking oxycodone about a year and a half previously, and he stated he took no over-the-counter medications because they did not help "that much." (R. at 1311.) Mullins stated his pain was worsened with prolonged sitting or standing, and seemed better with lying on his side. (R. at 1311.) Dr. Cho also noted Mullins's prior right shoulder replacement, stating his pain was controlled, but he had limited range of motion and difficulty lifting much with that arm. (R. at 1311.) Mullins advised he could independently perform daily activities, including light chores, such as laundry. (R. at 1311.) He admitted smoking daily, but denied illicit drug use. (R. at 1311.) Mullins also reported his history of heart attack with stenting and congestive heart failure. (R. at 1311.)

On examination, Mullins's blood pressure was 130/77; he had normal cardiac findings; radial and dorsalis pedis pulses were palpable; coordination, station and gait were initially unremarkable; he could do a few steps tandem heel-to-toe, but had difficulty walking on his forefoot/toes likely due to some leg weakness; he was able to do two squats before starting to shake during the third one, likely signifying some intrinsic weakness; straight leg raise testing was negative bilaterally; motor function was without obvious weakness on manual muscle testing, and no atrophy was appreciated; range of motion of the right shoulder was markedly limited to about 110/180 degrees; left shoulder range of motion and abduction were normal; lumbar flexion was limited to about 60/90 degrees; deep tendon reflexes were 1 in all extremities, and he had intact sensation to pinprick; orientation, affect, thought content and general fund of information were normal; and he had no obvious focal areas of myalgia or tenderness. (R. at 1312-13.) Dr. Cho diagnosed Mullins with

chronic low back pain with a history of T11-T12 instability, status-post arthrodesis; status-post right shoulder replacement; and history of heart attack and congestive heart failure. (R. at 1313.) Dr. Cho opined Mullins could stand/walk for two to three hours in an eight-hour workday, sit for four to six hours in an eight-hour workday; lift items weighing up to 25 pounds occasionally and up to 10 pounds frequently; he must avoid climbing, balancing, stooping, kneeling, crouching and crawling; and he must avoid reaching with the right arm. (R. at 1313-14.)

Mullins continued treating with Bentley in September 2014. On September 9, 2014, his blood pressure was 121/86. (R. at 1354.) Mullins stated he was unable to attend the RAM clinic, and he had not taken his blood pressure medications or his statin for two weeks because he could not get them refilled. (R. at 1355.) Mullins also reported missing doses of Synthroid, and had he stopped taking Plavix. (R. at 1355.) He again stated he had not followed up with cardiology. (R. at 1355.) Mullins's only complaints were anxiety, difficulty sleeping and stressors related to his physical health and personal life. (R. at 1356.) He requested sleep medication. (R. at 1356.) Mullins's physical and mental examinations were normal, including, among other things, full range of neck motion; normal cardiac findings; normal extremity findings; normal strength and sensation in all extremities; and he was alert, oriented and cooperative with good eye contact, intact cognitive function, good insight and judgment, clear speech, thought content without suicidal ideation or delusions and logical and goal-directed thought process. (R. at 1354.) In addition to her previous diagnoses, Bentley added anxiety state, unspecified, for which she prescribed Vistaril. (R. at 1354-55.) Mullins received medication vouchers. (R. at 1355.) She again advised Mullins to follow up with Dr. Kramer, a cardiologist, as soon as available, and she advised smoking cessation. (R. at 1355.) On September 29, 2014, Bentley prescribed Lasix. (R. at 1352.)

On September 17, 2014, David Deaver, Ph.D., a state agency psychologist, completed another PRTF, in connection with the reconsideration of Mullins's claims. (R. at 183-85, 205-06.) He found Mullins was mildly restricted in his activities of daily living, he had experienced mild difficulties maintaining social functioning, he had moderate difficulties maintaining concentration, persistence or pace, and he had experienced no repeated episodes of decompensation of extended duration. (R. at 184, 205.) Deaver noted Mullins's significant psychiatric history, but he had not had any psychiatric hospitalizations in the previous 12 months, and he currently was doing well off all medications. (R. at 184, 205.) Deaver also noted Mullins's allegation that he decompensates with stress. (R. at 184, 205.) Deaver also completed a mental residual functional capacity assessment, finding Mullins was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 189-90, 210-11.) In all other areas, Deaver opined Mullins was not significantly limited. (R. at 189-90, 210-11.) He concluded Mullins currently was stable, but might decompensate under stressful situations, and he found Mullins currently was able to meet the mental demands of simple, routine work. (R. at 190, 211.)

Also on September 17, 2014, Dr. Gene Godwin, M.D., a state agency physician, completed a physical residual functional capacity assessment of Mullins,

finding he could perform light work that did not require him to use the right arm for more than frequent pushing/pulling; that did not require more than occasional climbing of ramps/stairs, stooping, kneeling, crouching, crawling or reaching overhead with the right arm; no climbing of ladders, ropes or scaffolds; no more than frequent balancing; and that he should avoid concentrated exposure to temperature extremes, humidity, vibration and hazards. (R. at 186-88, 207-10.)

Mullins presented to the emergency department at Pikeville Medical Center on October 5, 2014, with complaints of leg pain and numbness in both feet, as well as weakness. (R. at 1395.) He denied back pain at that time, and his blood pressure was 127/92. (R. at 1395-96.) On examination, Mullins had musculoskeletal tenderness, but no edema; he had discomfort in the legs, bilaterally, with movement; and plantar reflexes were equivocal, possibly downgoing. (R. at 1396.) Mullins had a normal mood, affect and behavior. (R. at 1396.) A CT scan of the abdomen and pelvis showed no acute lumbar spine fractures or subluxation, but there was a distended bladder with mild bilateral hydronephrosis, likely secondary to the distended bladder. (R. at 1390.) The radiologist noted the need to clinically exclude a bladder obstruction. (R. at 1390.) Mullins was diagnosed with peripheral neuritis and chronic back pain, and he was discharged home in stable condition with a Medrol dosepak. (R. at 1388, 1397.)

On October 6, 2014, Mullins returned to Bentley to follow up on his emergency department visit. (R. at 1349-50.) He was in a wheelchair and stated he fell a couple of days previously, bruising his right knee and exacerbating his low back pain. (R. at 1349-50.) He continued to report paresthesia and numbness in both feet at times. (R. at 1350.) He also reported urinary incontinence since the previous day and an inability to ambulate without a walker. (R. at 1350.) Mullins stated he

was not taking the steroid he was given. (R. at 1350.) He denied substance abuse and suicidal thoughts. (R. at 1351.) Mullins was uncomfortable due to pain; he had tenderness to palpation of the lumbosacral spine; straight leg raise testing was positive bilaterally; he had lumbosacral tenderness; he had tenderness, slight swelling and redness of the right knee; and his gait was impaired. (R. at 1349.) Physical examination was normal otherwise, as was his mental status examination, which showed Mullins was alert, cooperative and oriented with intact cognitive function; good eye contact; good judgment and insight; clear speech; thought content without suicidal ideation or delusions; and logical and goal-directed thought process. (R. at 1349.) Bentley reviewed the CT scan from the emergency room visit, and lab work showed an elevated white blood cell count. (R. at 1350.) Bentley advised Mullins to return to the emergency department for further evaluation due to continued difficulty voiding and intermittent urinary incontinence. (R. at 1350.) She diagnosed lumbago; unspecified hereditary and idiopathic peripheral neuropathy; and unspecified urinary incontinence. (R. at 1349.) Bentley prescribed Flexeril and Neurontin, and she stated she would refer him for a neurosurgical consultation at the University of Virginia. (R. at 1349-50.) Mullins also received injections of Decadron, a corticosteroid, and Toradol, a nonsteroidal anti-inflammatory drug, ("NSAID"). (R. at 1350.)

The following day, Mullins presented to the emergency department at Pikeville Medical Center for further evaluation of his bladder condition. (R. at 1379.) He reported having bladder issues since his 2009 surgery, and he noted an increase in back pain over the years with more weakness in the lower extremities beginning four days previously. (R. at 1379.) Mullins also stated he was unable to ambulate for the previous week. (R. at 1385.) He complained of dysuria and frequency. (R. at 1380.) He, again, denied drug use. (R. at 1380.) On examination, Mullins's heart

rate was 120, but all other cardiac findings were normal. (R. at 1380.) He had mild tenderness in the suprapubic area, and palpation reproduced pain; he had mild tenderness to the bilateral paraspinous muscles from L2 to L4; but there was no swelling, tenderness, deformity or edema of the extremities, and pulses were excellent; strength and sensation were intact; and speech was clear; he was oriented with a normal affect; and he responded appropriately to questions. (R. at 1380.) Mullins was able to ambulate around the room with a steady gait. (R. at 1385.) He declined Flomax for bladder inflammation, stating it caused his "penis not to work." (R. at 1381.) He was diagnosed with an unspecified bladder disorder; chronic pain due to trauma; and back pain, not otherwise specified. (R. at 1379.) Mullins stated he would follow up with a urologist. (R. at 1381.)

When Mullins returned Bentley on October 13, 2014, he complained of fatigue, right flank pain and a rash to his abdomen and inner wrist. (R. at 1348.) His blood pressure was 91/63. (R. at 1346.) Mullins reported improved urine leakage with decreased input. (R. at 1348.) He denied anxiety, depression, substance abuse and suicidal thoughts. (R. at 1348.) His physical and mental examinations were normal, and Bentley diagnosed unspecified urinary incontinence; hypothyroidism; and hypertension, and she prescribed Flomax and referred him to a urologist. (R. at 1346-47.) Bentley also gave Mullins samples of Keflex, and she prescribed Permethrin cream for his rash. (R. at 1347.) She advised him to monitor his blood pressure and not take Lisinopril if it went below 110/60. (R. at 1347.)

Mullins presented to the emergency department at Pikeville Medical Center on October 23, 2014, with complaints of an inability to void. (R. at 1419.) On examination, Mullins was mildly tender to the suprapubic region; cardiac findings were normal; there was no extremity swelling, tenderness, edema or deformity, and

pulses were good; there was no back tenderness; and strength and sensation were intact. (R. at 1420, 1423.) Mullins also had normal mental status, including clear speech; full orientation; a normal affect; and appropriate responses to questions. (R. at 1420, 1423.) Mullins admitted smoking daily, but he denied drug use. (R. at 1423.) He was diagnosed with urinary retention and dysuria, a catheter was placed, and Bentley prescribed Cipro, Flomax and Vicodin. (R. at 1419-20, 1422, 1424.) Mullins was discharged in stable condition with instructions to follow up with Dr. Mark J. Swofford, D.O., a urologist. (R. at 1424.) Mullins returned to Pikeville Medical Center's emergency department on October 29, 2014, due to a catheter malfunction. (R. at 1409, 1416.) He received pain medication, and the catheter was reinserted without complication. (R. at 1413-14.) At that time, a physical examination showed, among other things, no back tenderness and excellent extremity pulses with no extremity tenderness, swelling or edema. (R. at 1410, 1413.) Mullins, again, denied drug use, as well as a history of depression or suicide attempts, and his mental status examination was normal. (R. at 1410, 1413.) He was discharged with a prescription for Norco. (R. at 1414.)

On November 3, 2014, Mullins presented to Dr. Swofford, a urologist, for moderate, intermittent urinary retention with associated symptoms including urgency and nocturia. (R. at 1373.) He stated these symptoms began after his back surgery and were relieved with a catheter, which was removed the previous night. (R. at 1373.) He also reported treatment to include Flomax, with good efficacy and no side effects. (R. at 1373.) Mullins continued to report smoking. (R. at 1374.) He denied anxiety and depression. (R. at 1375.) On examination, Mullins had an enlarged prostate, but no suprapubic tenderness; he had a normal gait; normal orientation and memory; and he was fully oriented with an appropriate mood and affect. (R. at 1376.) Dr. Swofford diagnosed urinary urgency and nocturia, and

Mullins received another catheter. (R. at 1376-77.)

Mullins continued to treat at The Health Wagon approximately monthly through August 2015. His complaints over this time included anxiety; depression; right foot and lower extremity pain; joint pain; muscle aches; chronic low back pain; abdominal pain; bloody stool; change in bowel habits; constipation; and intermittent numbness/tingling in the lower extremities. (R. at 1319, 1324, 1326-27, 1330-33, 1335, 1339, 1340-41, 1345, 1433-34.) Physical examinations over this time were largely normal. Mullins did exhibit an irregular heartbeat on one occasion, and he had positive straight leg raise testing, lumbosacral tenderness, cervical spine tenderness and limited hip range of motion at a few of these visits. (R. at 1319, 1323, 1325, 1330, 1334, 1337, 1344, 1432.) However, he consistently had normal cardiac findings, normal extremity strength and sensation and normal peripheral pulses. (R. at 1319, 1323, 1325, 1330, 1334, 1337, 1344, 1432.) On November 4, 2014, Mullins stated he was voiding without a catheter and was taking Toviaz daily. (R. at 1345.) On December 4, 2014, it was noted Mullins was "doing well." (R. at 1340.) On January 5, 2015, Mullins reported no significant changes in his health, and he said Flexeril was "80% effective" for his back pain. (R. at 1338.) He also reported voiding without difficulty with Flomax. (R. at 1338.) Also, on March 4, 2015, Mullins stated Neurontin sometimes improved his lower extremity neuropathy. (R. at 1335.) On March 31, 2015, he reported no new issues, but stated he had not followed up with cardiology and had stopped taking Plavix for financial reasons. (R. at 1331.) Bentley made another cardiology appointment for Mullins and advised him to apply for financial assistance. (R. at 1331.) However, on April 28, 2015, Mullins had not kept the cardiology appointment. (R. at 1325.) He received Decadron and Toradol injections. (R. at 1326.) On May 26, 2015, Mullins stated he had not rescheduled his cardiology appointment, and he had no new complaints. (R. at 1323.) He advised he

had stopped taking Flexeril because it was not working. (R. at 1323.) He received vouchers for medication refills, and Bentley gave him medical passes for endocrinology, cardiology with echo and orthopedics at the RAM clinic. (R. at 1323.) On June 3, 2015, Mullins left a voice message for Bentley, wanting to discuss returning to work. (R. at 1322.) On June 23, 2015, Bentley noted Mullins had failed to keep several cardiology appointments, and he had stopped Plavix. (R. at 1319.) He complained of increased back pain due to excess activity and increased tingling and numbness in the lower extremities. (R. at 1320.) Bentley stressed the importance of receiving medical care at the RAM clinic. (R. at 1320.) She increased Mullins's Lisinopril and Neurontin dosages, and Mullins received a Toradol injection. (R. at 1320.) By August 17, 2015, Mullins reported improved low back pain and lower extremity neuropathy with Neurontin. (R. at 1433-34.) Bentley made another cardiology appointment for him. (R. at 1433.) Over this time, Bentley diagnosed Mullins with hypertension; hyperlipidemia; benign localized hyperplasia of the prostate without urinary obstruction and other lower urinary tract symptoms; unspecified neuralgia, neuritis and radiculitis; other iatrogenic hypothyroidism; and personal history of noncompliance with medical treatment, presenting health hazards. (R. at 1320, 1325-26, 1330, 1335, 1337-40, 1433.) She prescribed various medications for Mullins's physical impairments over this time, including Lisinopril, Lasix, Atenolol, Flomax, Neurontin, Flexeril and Synthroid, and she repeatedly advised smoking cessation.

Regarding Mullins's mental health over this same time period, he mostly complained of anxiety, but denied depression, substance abuse and suicidal thoughts, and mental status examinations were mostly unremarkable. In March 2015, Mullins reported not taking Vistaril as prescribed. (R. at 1334.) Bentley prescribed BuSpar. (R. at 1335.) On March 31, 2015, Mullins complained of severe

anxiety, crying and stating BuSpar was not helping even though he "doubled the dosage." (R. at 1333.) He reported not being able to rest and being under a lot of stress. (R. at 1333.) Mullins stated he could not take anti-depressants, nor did he want to. (R. at 1333.) He requested Valium, but Bentley told him they did not prescribe medication for chronic anxiety. (R. at 1333.) On mental status examination, Mullins was alert, cooperative and oriented with intact cognitive functioning, but he was anxious and was crying and pacing. (R. at 1332.) Bentley diagnosed unspecified anxiety state and sent him to Frontier Mental Health for an evaluation. (R. at 1332.) By March 31, 2015, Mullins stated he was improved since the prior visit, and he denied suicidal ideation. (R. at 1330.) A mental status examination was normal. (R. at 1330.) On April 28, 2015, Mullins complained of chronic anxiety, but a mental status examination again was normal. (R. at 1325-27.) On May 26, 2015, Mullins stated he stopped taking BuSpar because it was not helping. (R. at 1323.) He complained of anxiety, but denied depression and suicidal thoughts. (R. at 1324.) Mental status examinations continued to be normal in May, June and August 2015. (R. at 1319, 1323, 1432.)

Mullins continued receiving treatment for his physical and mental complaints at The Health Wagon from October 2015 through March 2016. Mullins's complaints during this time remained much the same, as did his diagnoses and treatment. On November 25, 2015, he denied urinary issues, but complained of abdominal pain in the right upper quadrant and constipation. (R. at 1451.) Nonetheless, he stated he was doing ok. (R. at 1450.) Mullins was slow in making positional changes, but no other abnormalities were noted. (R. at 1450.) He again denied urinary issues on December 30, 2015, but complained of exacerbated low back pain over the previous few days. (R. at 1445.) He had positive straight leg raise testing bilaterally and lumbosacral tenderness. (R. at 1444.) Mullins received Decadron and Toradol

injections. (R. at 1446.) On January 27, 2016, Mullins reported chronic low back pain with tingling and numbness to the lower extremities at times, improved with Neurontin. (R. at 1441.) He exhibited lumbosacral tenderness. (R. at 1442.) He, again, received Decadron and Toradol injections. (R. at 1443.) On March 2, 2016, physical examination showed an irregular heartbeat, which Mullins described as "old." (R. at 1439.) He was diagnosed with atherosclerotic heart disease of the native coronary artery without angina pectoris, and he was advised to follow up with cardiology and quit smoking. (R. at 1439.)

As for Mullins's mental health over this time, mental status examinations consistently were normal, including being alert, cooperative and oriented with good eye contact, clear speech and full-range mood and affect. (R. at 1442, 1445, 1450.) On December 30, 2015, Mullins complained of anxiety, and he noted prior good results with Xanax. (R. at 1446.) Bentley diagnosed anxiety disorder and advised him to follow up with behavioral health. (R. at 1446.) On January 27, 2016, Mullins reported BuSpar did not help, but he did not wish to try other medications. (R. at 1441.) Bentley noted Mullins did not keep an appointment with behavioral health. (R. at 1443.)

Mullins presented to the emergency department at Norton Community Hospital on April 9, 2016, with complaints of epigastric pain radiating into the mid to low back, with associated nausea, vomiting and diarrhea. (R. at 1462, 1467.) Examination showed Mullins was in mild distress with back tenderness. (R. at 1468.) An abdominal/pelvic CT scan showed findings consistent with a chronic outlet obstruction of the bladder, prostate calcifications and a small left inguinal hernia. (R. at 1472.) Mullins was diagnosed with gastroenteritis, and he received Zofran. (R. at 1465, 1468.)

Mullins saw Patrick Farley, Ed.D., L.P.C., a licensed professional counselor, on August 16, 2016, for counseling. (R. at 1486.) At that time, his behavior was described as cooperative, withdrawn and restless; he was oriented and could remember one out of three items after 10 minutes; his affect and mood were described as dysphoric, anxious and sad; and he endorsed sleep disturbance, anergia, anhedonia and concentration difficulties. (R. at 1486.) There was no evidence of suicidal or homicidal ideation or plan. (R. at 1486.) Farley further noted Mullins had increased depression and family stressors.[16] (R. at 1486.) He opined Mullins's prognosis for a return to work was poor. (R. at 1486.) Farley referred Mullins back to the nurse practitioner for an anti-depressant and noted he would begin individual therapy focusing on challenging irrational thinking. (R. at 1486.) Farley noted Mullins's symptoms were chronic and treatment resistant and opined he was permanently unable to return to work. (R. at 1486.) He diagnosed Mullins with major depressive disorder, recurrent episode, mild, and he assessed his then-current GAF score at 45,[17] also noting this was his highest score over the prior year. (R. at 1486.)

That same day, Farley completed a mental assessment of Mullins, finding he was mildly limited in his ability to maintain personal appearance; moderately limited in his ability to follow work rules and to behave in an emotionally stable manner; markedly limited in his ability to relate to co-workers, to use judgment in public, to interact with supervisors, to function independently, to understand, remember and carry out simple and detailed job instructions and to relate predictably in social situations; and extremely limited in his ability to deal with the public, to deal with

---

[16] Much of Farley's note is illegible, but the court has done its best to decipher it accurately.

[17] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairments in social, occupational, or school functioning. …" DSM-IV at 32.

work stresses, to maintain attention/concentration, to understand, remember and carry out complex job instructions and to demonstrate reliability. (R. at 1482-84.) Farley also opined Mullins would be absent from work more than two days monthly. (R. at 1484.) He based his opinions on Mullins's symptoms of depression, panic, anxiety and chronic pain, which significantly and severely impaired his activities of daily living and cognitive and functional capacities. (R. at 1483.) Farley noted Mullins's symptoms were chronic and treatment resistant, and his prognosis for a return to work was poor. (R. at 1483.) Additionally, Farley noted that Mullins's symptoms, limitations and functional impairments had not improved and would continue to prevent him from effectively managing day to day stressors in the workplace. (R. at 1484.)

On August 19, 2016, Mullins complained of chest pain and weakness. (R. at 1478-80.) Chest x-rays showed no acute cardiopulmonary process, and a CT scan of the head showed no acute intracranial abnormality. (R. at 1478, 1480.) A urine drug screen was positive for cannabinoids. (R. at 1475.)

On October 5, 2016, Dr. Peter Schosheim, M.D., an orthopedic surgeon, completed a Medical Interrogatory related to Mullins's physical impairments at the ALJ's request for the time period of March 1, 2013, through the date of the evaluation. (R. at 1489-91.) Dr. Schosheim noted Mullins's impairments were status-post motor vehicle accident in February 2012 with subsequent surgical fusion; status-post myocardial infraction, stable; and status-post right shoulder replacement. (R. at 1489.) He found none of Mullins's impairments met or equaled a medical listing, as he had no permanent neurological findings, including no muscle atrophy or decreased muscle strength. (R. at 1489-90.) Dr. Schosheim also completed a physical assessment of Mullins for the same time period, finding he could lift/carry

items weighing up to 10 pounds frequently and up to 20 pounds occasionally; sit for a total of six hours in an eight-hour workday, but for one hour without interruption; and he could stand/walk for a combined total of two hours in an eight-hour workday, but for 30 minutes each without interruption. (R. at 1492-93.) Dr. Schosheim further opined Mullins could occasionally reach overhead with the right hand, but frequently reach in all other directions with the right hand, and he could continuously handle, finger, feel and push/pull with the right hand. (R. at 1494.) Dr. Schosheim found Mullins could continuously perform all these activities with the left hand. (R. at 1494.) He could frequently use both feet for the operation of foot controls, occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds. (R. at 1494-95.) Dr. Schosheim opined Mullins could frequently operate a motor vehicle, work around humidity and wetness, dust, odors, fumes and pulmonary irritants and temperature extremes; occasionally work around moving mechanical parts; and never work around unprotected heights and vibrations. (R. at 1496.) Dr. Schosheim also opined Mullins could work around loud noise. (R. at 1496.) He opined Mullins could perform activities like shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, two canes or two crutches; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for personal hygiene; and sort, handle or use paper or files; but he could not walk a block at a reasonable pace on rough or uneven surfaces. (R. at 1497.)

On December 27, 2016, Mullins saw Ramona Boyd, N.P., a nurse practitioner at The Health Wagon, for disability paper completion and medication refills. (R. at 1499.) A depression screen was negative, and Mullins had no complaints at that time. (R. at 1499.) His blood pressure was 132/88. (R. at 1500.) On examination, the only

abnormal findings were lumbosacral spine tenderness and positive straight leg raise testing. (R. at 1500.) Boyd diagnosed hypertension; hyperlipidemia; hypothyroidism; lumbago with sciatica; and other hereditary and idiopathic neuropathies. (R. at 1500.) She continued him on medications with vouchers. (R. at 1500-01.) Boyd also completed a physical assessment of Mullins, indicating he could occasionally lift/carry items weighing up to 15 pounds and frequently lift/carry items weighing less than five pounds. (R. at 1503.) She opined Mullins could stand/walk for a total of less than one hour in an eight-hour workday and could do so for less than one hour without interruption. (R. at 1503.) She made the same findings with regard to Mullins's ability to sit. (R. at 1504.) Boyd found Mullins could never climb, stoop, kneel, balance, crouch or crawl, and she opined Mullins's abilities to reach, to handle, to feel and to push/pull were affected by his impairments. (R. at 1504.) Additionally, Boyd found Mullins was restricted from working around heights, moving machinery and vibration. (R. at 1505.) Finally, Boyd opined Mullins would miss more than two workdays monthly. (R. at 1505.) She based her findings on sciatica and weakness in the lower extremities; his need to frequently change positions; numbness and tingling in the upper extremities and pain with range of motion in the right upper extremity after a right shoulder repair; neuropathy in both feet at times; prior neurogenic bladder previously requiring a catheter for six months after his motor vehicle accident; history of heart attack in 2009; and continued issues with urinary incontinence. (R. at 1503-05.)

On December 27, 2016, Boyd also completed a mental assessment of Mullins, finding he was mildly limited in his ability to follow work rules, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance and to behave in an emotionally stable manner; moderately limited in his ability to relate to co-workers, to understand, remember

and carry out detailed and complex job instructions and to demonstrate reliability; markedly limited in his ability to relate predictably in social situations; and extremely limited in his ability to deal with the public, to use judgment in public, to interact with supervisors, to deal with work stresses and to maintain attention/concentration. (R. at 1507-09.) She opined he would miss more than two workdays monthly. (R. at 1509.) Boyd noted Mullins was anxious on examination, made poor eye contact and was fidgety. (R. at 1508.) She noted his remote memory was better than recent memory, as he could recall what meals he ate, but lost his keys and cell phone on a daily basis. (R. at 1508.) Boyd also noted Mullins suffered from social agoraphobia, and he reported significant anxiety and frequent panic attacks. (R. at 1509.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2019).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The

court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Mullins argues that the ALJ improperly determined his residual functional capacity as of March 1, 2013. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-10.) In particular, Mullins argues that the ALJ erred by according improper weight to the opinions of Farley, Boyd and Dr. Cho. (Plaintiff's Brief at 9-10.)

It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

The ALJ found that, as of March 1, 2013, Mullins had the residual functional capacity to perform simple, unskilled sedentary work that allowed for restroom access during regularly scheduled breaks; that required no more than occasional

pushing/pulling with the upper extremities and no more than occasional overhead reaching with the right extremity; that required no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; that required no exposure to hazards; and that required no more than occasional exposure to temperature extremes, humidity or vibrations. (R. at 35.) In making this residual functional capacity finding, the ALJ stated that he was giving Dr. Cho's opinion "limited weight" because it was inconsistent with the objective findings and with Dr. Cho's own examination of Mullins. (R. at 38.) In August 2014, Dr. Cho, a consultative examiner, opined Mullins was limited to four to six hours of sitting during an eight-hour workday with unspecified rest breaks, that he should avoid all postural movements and that he could not reach at all with the right upper extremity. However, as the ALJ stated, Dr. Cho's restrictive opinions are not supported by his own examination findings, including initially unremarkable coordination, gait and station; an ability to perform two squats before exhibiting shakiness during the third; negative bilateral straight leg raise testing; and normal strength and sensation without atrophy. (R. at 38.) The ALJ found the weakness Mullins exhibited with repeated squatting did not justify a complete prohibition of all postural movements, and the complete prohibition on reaching with the right arm was inconsistent with Dr. Cho's examination, revealing Mullins could reach up to 110 degrees. (R. at 38.) *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (2019) (generally, the more consistent a medical opinion is with the record as a whole, the more weight it will be given); *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (the more a medical source's opinion is supported by relevant evidence, including medical signs and laboratory findings, the more weight it will be given).

Instead, the ALJ gave "significant weight" to the opinion of Dr. Schosheim, an orthopedic surgeon, who specifically was employed by the Agency to determine

Mullins's condition after February 2013, including the accuracy of Dr. Cho's opinion and whether Mullins was precluded from sedentary work. (R. at 38.) The ALJ noted Dr. Schosheim's status as a specialist in the area of evaluation, and he stated Dr. Schosheim's opinion was more consistent with the objective evidence. (R. at 38-39.) *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (generally, more weight will be given to the medical opinion of a specialist about medical issues related to his area of specialty). Specifically, Dr. Schosheim opined, among other things, Mullins could perform sedentary work with six hours sitting and two hours combined standing and walking in an eight-hour workday. (R. at 1493.) He further opined Mullins had no left upper extremity restrictions, and he could occasionally reach overhead with the right upper extremity. (R. at 1494.) Finally, Dr. Schosheim opined Mullins could perform occasional postural movements, except for climbing of ladders or scaffolds, which he could not do.[18] (R. at 1495.) The ALJ correctly noted that Dr. Schosheim reviewed almost all the medical evidence of record and opinions rendered by treating and examining practitioners in forming his opinion. (R. at 38.) Dr. Schosheim additionally supported his opinion by stating that Mullins had no neurological findings, normal muscle strength and no muscle atrophy. (R. at 38.) Specifically, the ALJ stated he was not accepting Dr. Schosheim's opinion that Mullins could only frequently reach in directions other than overhead with the right arm because he had range of motion to 110 degrees at the consultative evaluation.

---

[18] The court notes that the ALJ did not include this restriction regarding the climbing of ladders, ropes or scaffolds in his discussion of the weighing of the evidence or in his ultimate residual functional capacity assessment. This is of no consequence, however, as sedentary work does not require such postural activity. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) (citations omitted) (errors are harmless in social security disability cases when it is inconceivable that a different administrative conclusion would have been reached absent the error); *see also* Social Security Ruling, ("S.S.R."), 96-9p (West Supp. 2013) (postural limitations, including the climbing of ladders, ropes or scaffolds, would not usually erode the occupational base for a full range of unskilled sedentary work because such activities usually are not required in sedentary work).

(R. at 38.) The ALJ further stated this represented a range of motion of a little over shoulder level, and there was no indication Mullins had difficulty reaching frontwards, backwards or to the side, if it was less than 110 degrees. (R. at 38.)

The ALJ gave "some weight" to the opinion of state agency physician Dr. Godwin, who opined Mullins could perform a restricted range of light work with restrictions, including occasional reaching overhead with the right upper extremity. (R. at 37.) Dr. Godwin supported his opinion by noting Mullins's mostly normal shoulder functioning except for limited range of motion. (R. at 37.) However, for the reasons stated above, the ALJ gave more weight to Dr. Schosheim's opinion that Mullins could perform sedentary work, not light work. (R. at 37-38.)

The ALJ gave "little weight" to nurse practitioner Boyd's opinion that Mullins could sit, stand and walk for less than an hour each and that he could never perform postural activities. (R. at 39.) Boyd saw Mullins only once before rendering this opinion, and there was no evidence she reviewed any of Mullins's other treatment notes or diagnostic testing results. (R. at 39.) *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) (generally, the longer a treating source has treated a claimant and the more times a claimant has been seen by a treating source, the more weight the sources' medical opinion will be given). The ALJ also found Boyd's opinion was inconsistent with the objective medical evidence and appeared to be based on Mullins's subjective reports. (R. at 39.) *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). A physician's opinion based upon a claimant's subjective complaints is not entitled to deference and should be rejected. *See Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005). For example, Boyd reported numbness and weakness as support for some of her findings, but her physical examination of Mullins showed normal strength and sensation. (R. at 39.) Moreover, as stated herein, Dr. Schosheim,

who reviewed the entire record, reported that Mullins had no neurological or motor deficits. (R. at 39-40.) The court further notes that Boyd's opinions are contained in a check-box form, which this court has found are entitled to little weight. *See Cooper v. Saul*, 2019 WL 6703557, at *10 (W.D. Va. Oct. 29, 2019) (citing *Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form report, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (check-box forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-the-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician)).

In his thorough and well-reasoned opinion, the ALJ also stated that Mullins's treatment essentially had been routine/conservative since March 2013 and generally had been successful in controlling his symptoms. (R. at 41.) In particular, the ALJ stated that imaging subsequent to the July 2012 spinal fusion showed healed fractures and well-maintained disc spaces. (R. at 41.) Since that time, the ALJ stated, Mullins did not undergo significant treatment for his pain, such as the use of opioid medications due to his former substance abuse addiction. (R. at 41.) Mullins also denied taking over-the-counter pain medications. Contrary to the ALJ's statement that Mullins did not receive epidural steroid injections or non-opioid pain medications, the record shows he received multiple Decadron and Toradol injections. Nonetheless, as the ALJ stated, Mullins had mostly mild findings related to his lumbar spine, including tenderness to palpation and limited range of motion, but he also had normal strength and sensation in the lower extremities, as well as a

normal gait. (R. at 42.) Although he appeared in a wheelchair at an appointment in October 2014, there is no record evidence he was ever prescribed any assistive device. (R. at 42.) Moreover, Mullins was using the wheelchair after an acute exacerbation of low back pain after falling. Thus, regarding his back impairment, the ALJ found that such findings supported a restriction to sedentary work that allowed for a limited amount of standing and walking and the occasional performance of postural activities. (R. at 41, 42.) Additionally, regarding Mullins's shoulder impairment, the ALJ noted a lack of significant treatment. (R. at 41.) Although the record shows he had a limited range of motion, it would not preclude sedentary work. Likewise, regarding Mullins's cardiac impairment, the ALJ stated he had mentioned symptoms only a couple of times since February 2013 and had not followed up with a cardiologist for a few years. (R. at 41.) This, the ALJ stated, suggested any cardiac limitations Mullins had would not preclude him from performing sedentary work. (R. at 41.) Regarding his urological impairment, the ALJ noted Mullins had not seen a urologist for years and had not consistently complained of urinary issues. (R. at 41.) Thus, the ALJ stated he imposed only the limitation of requiring regular bathroom breaks in his residual functional capacity finding. (R. at 41.)

In addition to these findings made by the ALJ, the court notes Mullins's repeated statements that Neurontin improved his lower extremity neuropathy, and Flexeril was "80% effective" in improving his back pain. Mullins's hypertension also was controlled with medication, and in November 2014 and January 2015, he advised Flomax provided "good efficacy" with no side effects. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). Mullins's ability to independently perform activities of daily living further belies a contention of disability. At his

initial hearing, he stated he could drive, and he rode around with a friend. He also helped care for his friend's ill wife. In October 2013, Mullins reported he went out with a friend and did a lot of "running." He stated he liked being outside, and he could perform household chores like vacuuming, laundry and cooking. He stated he could travel unaccompanied. In August 2014, Mullins again reported an ability to independently perform daily activities.

Lastly, I would note Mullins's serious noncompliance with treatment in several regards. First, he failed to follow through with repeated cardiology appointments. Despite his claims that he could not afford such treatment, Mullins failed to attend cardiology, endocrinology and orthopedic appointments at free RAM clinics. He also failed to keep multiple urology appointments. Finally, despite being strongly encouraged to stop smoking, it does not appear Mullins ever did.

Next, I will discuss the ALJ's weighing of the evidence relevant to Mullins's mental impairments. The ALJ gave "significant weight" to the opinion of Jones, a senior psychological examiner. (R. at 39.) Jones opined Mullins was not limited in his ability to understand, remember and perform simple and detailed instructions, as well as his ability to interact appropriately with others and respond appropriately to changes in the work setting; and mildly limited in his ability to sustain concentration and persistence due to anxiety, but he could work around others without being distracted. (R. at 39.) The ALJ noted that Jones administered an objective mental status examination, which supported her opinion, as Mullins exhibited no significant abnormalities. (R. at 39.) *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). He noted further that Jones's opinion was consistent with the other medical evidence of record, which showed generally normal mental status examinations and few complaints of mental symptoms since February 2013. (R. at 39.) *See* 20 C.F.R. §§

404.1527(c)(4), 416.927(c)(4). Despite Jones's finding that Mullins could perform detailed work, the ALJ limited him to simple work, given Jones's opinion that he might have mild limitation in the ability to sustain persistence and concentration due to anxiety. (R. at 39.) The ALJ stated such a finding was consistent with the evidence that Mullins took BuSpar for anxiety, but he did not seek additional treatment or have significant mental status abnormalities. (R. at 39.) More specifically, the ALJ noted that his restriction to simple work gave some weight to Mullins's subjective allegations. (R. at 39.)

The ALJ gave "no weight" to nurse practitioner Boyd's check-box mental assessment of Mullins, in which she opined he had either marked or extreme limitations in the majority of areas of mental functioning, including his ability to deal with the public, to deal with work stress, to maintain attention and to relate predictably in social situations. (R. at 40.) The ALJ stated Boyd's opinion appeared to be based entirely on Mullins's allegations, *see Johnson*, 434 F.3d at 657, and it was inconsistent with her mental status examination of Mullins which was normal. (R. at 40.) *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Additionally, Boyd did not render any significant mental health treatment to Mullins, and as noted above, she saw him on only one occasion before rendering this opinion. (R. at 40.) *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). Moreover, the ALJ stated Boyd did not explain her opinion, and he further noted Mullins had not sought significant mental health treatment after February 2013. (R. at 40.) Also, Mullins's treatment has been routine and conservative, including beginning BuSpar for anxiety around late 2015. (R. at 40.) He has denied needing any additional medication, his mental status findings have been consistently normal, and he typically denied all mental symptoms. (R. at 40.)

Finally, the ALJ gave counselor Farley's 2016 opinion "little weight." (R. at 40.) Farley opined that Mullins was "permanently unable to return to work." (R. at 1486.) Farley opined that Mullins was either markedly or extremely limited in most areas of mental functioning assessed. (R. at 1482-84.) He further opined Mullins would miss more than two workdays monthly. (R. at 1484.) The ALJ correctly noted that Farley saw Mullins only once – the same day he rendered this opinion – since February 2013. (R. at 40.) He further noted that Farley's opinion was contained in a check-box form, and he failed to explain his findings. (R. at 40.) As stated herein, this court has found that such check-box reports are not entitled to great weight. *See Cooper*, 2019 WL 6703557, at *10 (citations omitted). The ALJ stated that, although Farley cited some alleged symptoms, he did not cite any "cogent objective evidence." (R. at 40.) The ALJ noted that Mullins's allegations of mental symptoms were inconsistent with his multiple denials of such to treating practitioners after February 2013. (R. at 40.) Furthermore, Mullins did not seek significant mental health treatment after February 2013. (R. at 40.) He began taking BuSpar for anxiety in late 2015, but he stated he did not need any additional medication; he consistently had normal mental status findings; and he usually denied all mental symptoms. (R. at 40.) In addition, Farley's opinion that Mullins is disabled is not a medical opinion, but a dispositive administrative finding on an issue reserved to the Commissioner and, therefore, is not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3) (2019).

The ALJ stated he gave Mullins's subjective allegations "some weight" in limiting him to simple work, but his lack of mental health complaints and treatment supported no further limitations. (R. at 41.) The ALJ noted Mullins's reports of socializing with friends and a couple of women, going around with his friend and helping care for his friend's wife. (R. at 41.) Thus, the ALJ found such activities

inconsistent with the existence of a disabling mental impairment and, in fact, suggested no limitations in the area of social functioning. (R. at 41.) The court also points out that Jones, in October 2013, stated Mullins had no difficulty relating to her and should have no difficulty relating to others. Moreover, the ALJ noted that Mullins had not required any psychiatric hospitalizations since he stopped abusing substances in February 2013. (R. at 41.)

Based on all the above, I find that substantial evidence exists in the record to support the ALJ's finding that Mullins was not disabled beginning March 1, 2013. An appropriate Order and Judgment will be entered.

DATED:     March 24, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE